# EXHIBIT A



$275

COMMONWEALTH OF MASSACHUSETTS

Worcester, SS.                                    Worcester Superior Court
                                                 Civil Action No. 22- 1149A

Robin L. Boucher                          )
Cary D. Boucher                           )
                    Plaintiffs,           )
        v.                                )       **FILED**
                                          )
U.S. Bank National Association, as Trustee for the  )    OCT 12 2022
RMAC Trust, Series 2016-CTT, successor in  )
Interest to Mortgage Electronic Registration  )    ATTEST [signature] CLERK
Systems, Inc. as nominee for National Future  )
Mortgage, Inc.                            )
                                          )
                    Defendant             )

## **VERIFIED COMPLAINT FOR EMERGENCY INJUNCTIVE RELIEF and DECLARATORY JUDGMENT**

Introduction

        This is an action seeking to enjoin the Defendant U.S. Bank National as Association as

Trustee ("U.S. Bank") from foreclosing on the Plaintiff's primary residence located at 7

Fairbanks Lane in North Reading, Massachusetts ("Residence"). The foreclosure is scheduled for

tomorrow, October 13, 2022 at 11:00 a.m..  A copy of the Notice of Foreclosure is attached.  The

deed title owners of the property are the Plaintiffs Robin L Boucher ("Robin) and Cary D.

Boucher ("Cary") (jointly "Boucher"). The property is the sole residence for the plaintiffs and

their family.

        The foreclosure auction should be enjoined for the following reasons: (1) the Note which

is the foundation of the Mortgage security interest being foreclosed upon is no longer valid as a

matter of law because the six-year statute of limitations to collect upon the Note has long since lapsed; (2) The Boucher's were never properly noticed regarding the foreclosure date.  They simply were not mailed Notice of the foreclosure auction date to their Residence; (3) The signature on the assignment of the mortgage is Holly Hardy. Ms. Hardy has been shown to be part of a larger fraud regarding mortgage assignments and her signature, upon information and belief, is not valid; (4) Robins's signature is not on the Note or Mortgage; and (5) U.S. Bank does not properly own the mortgage which is being foreclosed upon.

Attached is an analysis of the failings of U.S. Bank's ownership of the Note and Mortgage and the validity of the Note and Mortgage by Mortgage Compliance Investigations, LLC.

Parties

1.      The Plaintiff, Cary D. Boucher ("Cary") is an individual currently residing at 7 Fairbanks Lane in Middlesex County, Massachusetts ("Residence").

2.      The Plaintiff, Robin L. Boucher ("Robin") is an individual currently residing at 7 Fairbanks Lane in Middlesex County, Massachusetts ("Residence").

3.      The Defendant, U.S. Bank National Association, as Trustee for the RMAC TRuste, Series 2016-CTT, successor in Interest to Mortgage Electronic Registration Systems, Inc. as nominee for National Future Mortgage, Inc.is purportedly the holder of certain paper relating to the Residence ("U.S. Bank") upon information and belief does business throughout Worcester County and the entire Commonwealth of Massachusetts.

**Count I: Declaratory Judgment**

4.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 3

contained above.

5.     The deed title owners of the property are Robin and Cary. They have owned the property

since February 5, 2003.


*Note and Mortgage no Longer Enforceable*

6.     The last payment made on the Note was more than six years ago.  This date is far more

than six years from the day of the filing of this above captioned lawsuit. As a consequence of the

lapse of six years since the last payment on the Note, as a matter of Massachusetts state law the

Note is no longer enforceable and is no longer collectible.  The Note is nothing more than a

contract to repay monies lent and the statute of limitations to collect on a contract to collect is six

years.

7.     With the Note no longer valid, the Mortgage security interest on the Boucher home which

was executed in parallel to secure the Note is no longer enforceable.  When the underlying debt

which a security interest seeks to secure is invalidated, so to is the security interest.  As a matter

of law and public policy, a security interest cannot secure an interest that no longer exists.

8.     The foreclosure auction scheduled for tomorrow, October 12, 2022 cannot go forward as

it is seeking to foreclosure on the Residence with no foundational valid Mortgage security

interest as its foundation.


*Improper Notice of Foreclosure Auction*

9.     U.S. Bank never sent a copy of the Foreclosure Notice to the Bouchers at the Residence.

The only reason that the Bouchers became aware of the auction was because an individual living

at 1209 Edgewater Drive, suite 203 in Orlando Florida (the address on the attached Notice)

forwarded it the Notice to the Residence which address was delineated in the Ntoice.

10.     Massachusetts is a non-judicial notice foreclosure state and lenders seeking to foreclose

must strictly comply with the Notice requirements to foreclose.  U.S. Bank did not do this.

11.     The foreclosure auction scheduled for tomorrow, October 12, 2022 cannot go forward as

it is seeking to foreclosure on the Residence without providing the proper Notice of such

foreclosure.

### The Assignment of the Mortgage is not Valid

12.      The original note and mortgage were purportedly assigned from Nationstar Mortgage to

U.S. Bank in May of 2018.  A copy of the Assignment is attached hereto.  The Assignment is

signed by Holly Hardy as the representative of Nationstar.

13.     Holly Hardy was part of a large mortgage fraud scheme investigated and prosecuted by

the U.S. Attorney's office in western North Carolina. Attached hereto is a copy of the U.S

Attorney's press release regarding the scheme from December 3, 2014.

14.     Without a proper and authorized signature, any assignment is invalid.  If U.S. Bank does

not properly own the Note and mortgage, then the foreclosure auction scheduled for tomorrow,

October 12, 2022 cannot go forward.

### Note and Mortgage are invalid and unenforceable as Robin's signature is not on Note

15.     U.S. Bank is ostensibly attempting to foreclosure on a mortgage securing a Note

obligation from the Bouchers  The problem for U.S. Bank is that Robin's signature is not on the

Note which the mortgage is attempting to secure.

16.     The Note is attached to the Notice of Foreclosure sale exhibit filed with this Complaint. As is clear, Robin's signature is not on it.

17.     The Note is invalid and the mortgage securing the Boucher's interest in invalid as Robin never signed the Note.

18.     The foreclosure auction scheduled for tomorrow, October 12, 2022 cannot go forward.


        WHERFORE, the Plaintiffs requests that this Honorable Court declare that the Mortgage security interest and Note no longer enforceable and invalidate any scheduled foreclosure auction, along with all further relief in favor of the Plaintiffs including reimbursement of attorneys' fees and costs.


### Count II: Injunctive Relief

10.     The Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 198contained above.

11.     Defendant U.S.Bank has scheduled an auction on the Boucher's residence for tomorrow, October 22, 2022. This foreclosure auction, as in all foreclosure auctions, seeks to collect on the Note by foreclosing on the Mortgage security interest.

12.     As stated above, the Note which the Mortgage security interest *secures* is no longer enforceable and collectable as a matter of law for the reasons stated in the previous paragraphs.

13.     The Mortgage security interest being foreclosure upon is no longer valid as it is not securing anything anymore. In addition, U.S. Bank does not properly own the mortgage and note.  Further, U.S. Bank did not provide proper Notice of the foreclosure auction.

14.     If the foreclosure auction is allowed to proceed, it will cause irreparable harm to the Bouchers because they will lose their residence and the home in which they live and in which they raised their family.  They will, in essence, become homeless.

15.     U.S. Bank will not suffer any harm because a delay in the foreclosure auction to allow this lawsuit to proceed will not prejudice it in any meaningful way. U.S. Bank  has not received any payments in over six years and a further delay will be harmless.  Further, if U.S. Bank's Mortgage security interest is deemed still valid by this Honorable Court then it is fully secured of repayment.

16.     The Boucher's have a high likelihood of success on the merits of theircase. And the harm to them by not granting Injunctive Relief and stopping the foreclosure auction is far greater than any harm that would come to U.S. Bank by any such delay.

WHERFORE, the Plaintiffs requests that this Honorable Court grant injunctive relief prohibiting and canceling the foreclosure auction currently scheduled for tomorrow, October 22, 2023, along with all further relief in favor of the Plaintiffs including reimbursement of attorneys' fees and costs.

PLAINTIFF REQUESTS A TRIAL BY JURY

Cary D. Boucher
Robin L. Boucher
By their Attorney,

/s/ James P. Ehrhard
James P. Ehrhard, Esq.
BBO#651797
Ehrhard & Associates, P.C.
250 Commercial Street, suite 410
Worcester, MA 01608
508.791.8411
ehrhard@ehrhardlaw.com

Dated:  October 22. 2022

## VERIFICATION

I, Robin Boucher, being duly sworn, say that I have read the foregoing Verified Complaint, that I am familiar with the contents thereof, and that the averments in said Complaint are true to the best of my personal knowledge, information and belief.

Robin L. Boucher

## VERIFICATION

I, Cary D. Boucher, being duly sworn, say that I have read the foregoing Verified Complaint, that I am familiar with the contents thereof, and that the averments in said Complaint are true to the best of my personal knowledge, information and belief.

Cary D. Boucher

# BENDETT & McHUGH, P.C.
## ATTORNEYS AT LAW

August 15, 2022

Cary D. Boucher
1209 Edgewater Drive, Suite 203
Orlando, Florida 32804

RE:  Cary D. Boucher and Robin L. Boucher
      7 Fairbanks Lane, North Reading, MA 01864

Dear Cary D. Boucher:

This office has been retained by U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT, {successor in interest to Mortgage Electronic Registration Systems, Inc. as nominee for National Future Mortgage, Inc. } in connection with the mortgage loan on the above-referenced property.   In accordance with the provisions of Massachusetts General Laws Chapter 244, Section 14, you are hereby notified of the foreclosure sale of the above-referenced property on October 13, 2022, all in accordance with the attached legal notice of Mortgagee's Sale of Real Estate.  Publication of this notice is scheduled to begin on or about September 8, 2022, in the North Reading Transcript.

Enclosed herein please also find a deficiency notice, which is being provided to you pursuant to Massachusetts General Laws, Chapter 244, Section 17B.  If the debt secured by your mortgage has been discharged in bankruptcy, no demand for payment of the loan is being made, and this notice is given solely to comply with the statute.

This communication is from a debt collector.

Very truly yours,

/s/ Geoffrey Moore

Geoffrey R. Moore
GRM/dmh
Enclosures
Certified Mail/RRR and Regular Mail (copy)
**NOTICE:  THE LAW FIRM OF BENDETT & MCHUGH, PC IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.  IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

# BENDETT & McHUGH, P.C.
## ATTORNEYS AT LAW

August 15, 2022

TO:  Cary D. Boucher

RE:   <u>NOTICE OF INTENTION TO FORECLOSE AND OF
DEFICIENCY AFTER FORECLOSURE OF MORTGAGE</u>

You are hereby notified, in accordance with Massachusetts General Laws, Chapter 244, § 14 and
Chapter 244, § 17B of the intention of U.S. Bank National Association, not in its individual capacity but
solely as Trustee for the RMAC Trust, Series 2016-CTT, successor-in-interest / successor-by-merger to
Mortgage Electronic Registration Systems, Inc. as nominee for National Future Mortgage, Inc., on or
after October 13, 2022 to foreclose by sale under the Power of Sale for breach of conditions of the
mortgage held by U.S. Bank National Association, not in its individual capacity but solely as Trustee for
the RMAC Trust, Series 2016-CTT on property at 7 Fairbanks Lane, North Reading, Massachusetts,
dated July 28, 2008, and recorded with the Middlesex County (Southern District) Registry of Deeds in
Book 51535 at Page 48 to secure a certain Promissory Note given by Cary D. Boucher for the whole or
part of which you may be liable to U.S. Bank National Association, not in its individual capacity but
solely as Trustee for the RMAC Trust, Series 2016-CTT, if allowed by law, in case of a deficiency in the
proceeds of the foreclosure sale.


**NOTICE:  THE LAW FIRM OF BENDETT & MCHUGH, PC IS A DEBT COLLECTOR
AND IS ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION WE OBTAIN
WILL BE USED FOR THAT PURPOSE.  IF YOU HAVE PREVIOUSLY RECEIVED A
DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS
CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN
ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST
PROPERTY.**

## NOTICE OF MORTGAGEE'S SALE OF REAL ESTATE

Premises: 7 Fairbanks Lane, North Reading, Massachusetts

By virtue and in execution of the Power of Sale contained in a certain mortgage given by Cary D. Boucher and Robin L. Boucher to Mortgage Electronic Registration Systems, Inc. as nominee for National Future Mortgage, Inc., said mortgage dated July 28, 2008 and recorded in the Middlesex County (Southern District) Registry of Deeds, in Book 51535 at Page 48 and now held by U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT by virtue of an assignment from Nationstar Mortgage LLC to U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT dated May 17, 2018 and recorded in Middlesex County (Southern District) Registry of Deeds, in Book 71030 at Page 431; previously assigned by New York Community Bank to Nationstar Mortgage LLC, by virtue of an assignment, dated May 25, 2011 and recorded in Middlesex County (Southern District) Registry of Deeds, in Book 56958 at Page 129; previously assigned by Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for National Future Mortgage, Inc., its successors to New York Community Bank, by virtue of an assignment, dated August 4, 2010 and recorded in Middlesex County (Southern District) Registry of Deeds, in Book 55182 at Page 450, for breach of the conditions in said mortgage and for the purpose of foreclosing the same, will be sold at **Public Auction on October 13, 2022 at 11:00 AM Local Time** upon the premises, all and singular the premises described in said mortgage, to wit:

THE LAND IN NORTH READING, MIDDLESEX COUNTY, MASSACHUSETTS AND BEING SHOWN AS LOT NO. 7 ON A PLAN ENTITLED, "DEFINITIVE SUBDIVISION PLAN OF FAIRBANKS ESTATES", PREPARED FOR: TOWER HOMES, INC.", BY THOMAS E. NEVE ASSCIATES, INC., ENGINEERS – SURVEYORS – LAND USE PLANNERS, DATED JUNE 1, 2001 RECORDED WITH MIDDLESEX COUNTY (SOUTHERN DISTRICT) REGISTRY OF DEEDS, PLAN NUMBER 32 OF 2002, INSTRUMENT NO. 1256 OF JANUARY 10TH, 2002.

BEGINNING AT A POINT ON THE SOUTHERLY SIDELINE OF FAIRBANKS LANE A THE FRONT CORNER OF LOTS 7 AND 8;

THENCE TURNING AND RUNNING ALONG THE SOUTHERLY SIDELINE OF FAIRBANKS LANE SOUTH 86 DEGREES 05 MINUTES 26 SECONDS EAST A DISTANCE OF 155.71 FEET TO A POINT;

THENCE TURNING AND RUNNING ALONG THE SOUTHERLY SIDELINE OF FAIRBANKS LANE ALONG A CURVE TO THE RIGHT HAVING A RADIUS OF 323.75 FEET A DISTANCE OF 12.50' TO A CORNER OF LOT 6;

THENCE TURNING AND RUNNING ALONG LOT 6 SOUTH 05 DEGREES 10 MINUTES 44 SECONDS WEST A DISTANCE OF 86.81 FEET TO A POINT;

THENCE TURNING AND RUNNING ALONG LOT 6 SOUTH 04 DEGREES 07 MINUTES 23 SECONDS EAST A DISTANCE OF 420.69 FEET TO A CORNER AT LAND OF NORTH HILL

RECREATIONAL TRUST, LAND OF 1998 REALTY TRUST AND LOT 6;

THENCE TURNING AND RUNNING ALONG LAND OF NORTH HILL RECREATIONAL TRUST NORTH 63 DEGREES 25 MINUTES 09 SECONDS WEST A DISTANCE OF 238.34 FEET TO A CORNER AT LOT 8;

THENCE TURNING AND RUNNING ALONG LOT 8 NORTH 05 DEGREES 46 MINUTES 38 SECONDS EAST A DISTANCE OF 366.13 FEET TO A POINT;

THENCE TURNING AND RUNNING ALONG LOT 8 NORTH 16 DEGREES 32 MINUTES 18 SECONDS WEST A DISTANCE OF 48.87 FEET TO THE POINT OF BEGINNING.

MEANING AND INTENDING TO CONVEY LOT 7, CONTAINING 81,036 SQUARE FEET OR 1.86 ACRES OF LAND AS SHOWN ON A DEFINITIVE SUBDIVISION PLAN OF "FAIRBANKS ESTATES", NORTH READING, MASSACHUSETTS, SHEET 2 OF 9, PREPARED FOR TOWER REALTY TRUST AND PREPARED BY THOMAS E. NEVE ASSOCIATES, INC. REVISED DATED OCTOBER 29, 2001.

ADDRESS: 7 FAIRBANKS LANE; NORTH READING, MA 01864
TAX MAP OR PARCEL ID NO.: 61-99

The description of the property that appears in the mortgage to be foreclosed shall control in the event of a typographical error in this publication.

For Mortgagors' Title see deed dated January 31, 2003, and recorded in Book 37909 at Page 107 with the Middlesex County (Southern District) Registry of Deeds.

TERMS OF SALE: Said premises will be sold and conveyed subject to all liens, encumbrances, unpaid taxes, tax titles, municipal liens and assessments, if any, which take precedence over the said mortgage above described.

FIVE THOUSAND ($5,000.00) Dollars of the purchase price must be paid by a certified check, bank treasurer's or cashier's check at the time and place of the sale by the purchaser. The balance of the purchase price shall be paid in cash, certified check, bank treasurer's or cashier's check within sixty (60) days after the date of sale.

Other terms to be announced at the sale.

BENDETT & MCHUGH, PC
270 Farmington Avenue
Farmington, CT 06032
Attorney for U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT
Present Holder of the Mortgage
(860) 677-2868

## CERTIFICATE RELATIVE TO FORECLOSING PARTY'S
## RIGHT TO FORECLOSE PURSUANT TO 209 C.M.R 18.21A(2)(c)

The undersigned, *Paul Romero*, having personal knowledge of the facts herein stated, hereby certifies as follows:

1. I am a __Assistant Secretary__ of Rushmore Loan Management Services LLC.

2. Rushmore Loan Management Services LLC is a loan servicer within the meaning of 209 C.M.R. 18.02 for U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT with respect to that certain mortgage given by Cary D. Boucher and Robin L. Boucher to Mortgage Electronic Registration Systems, Inc. as mortgagee, as nominee for National Future Mortgage, Inc., its successors and assigns dated July 28, 2008, and recorded with Middlesex County (Southern District) Registry of Deeds in Book 51535, Page 48 (the "Mortgage"). Said mortgage is affected by a Judgment which reformed the mortgage to included Robin L. Boucher as a borrower dated September 23, 2020, recorded or filed in Middlesex County (South District) Registry of Deeds in Book 75991, Page 487.

3. The Mortgage encumbers property known as 7 Fairbanks Lane, North Reading, Massachusetts 01864 (the "Property").

4. According to a review of our business records, the record holder of the Mortgage as of the date of this certification is U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT. The chain of recorded assignments of the Mortgage is set forth as follows:
Mortgage:   From Cary D. Boucher and Robin L. Boucher to Mortgage Electronic Registration Systems, Inc. as mortgagee, as nominee for National Future Mortgage, Inc., its successors and assigns, dated 7/28/2008:

   [X] recorded in Middlesex County (Southern District) Registry of Deeds in Book 51535, Page 48.

   [ ] filed in Middlesex Registry District of the Land Court as Document No. ____ and noted on Certificate of Title No.____ .

   Assigned to U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT by assignment(s) dated and recorded/files as follows:

Assignment from Nationstar Mortgage LLC to U.S. Bank National Association, not in its individual capacity, but solely as Trustee for the RMAC Trust, Series 2016-CTT dated May 17, 2018.

[X] recorded Middlesex County (Southern District) Registry of Deeds in Book 71030, Page 431.

[ ] filed in Middlesex Registry District of the Land Court as Document No. _____ and noted on Certificate of Title No. _____.

Assignment from New York Community Bank to Nationstar Mortgage LLC dated May 25, 2011.

[X] recorded Middlesex County (Southern District) Registry of Deeds in Book 56958, Page 129.

[ ] filed in Middlesex Registry District of the Land Court as Document No. _____ and noted on Certificate of Title No. _____.

Assignment from Mortgage Electronic Registration Systems, Inc., as mortgagee, as nominee for National Future Mortgage, Inc., its successors and assigns to New York Community Bank dated August 4, 2010.

[X] recorded Middlesex County (Southern District) Registry of Deeds in Book 55182, Page 450.

[ ] filed in Middlesex Registry District of the Land Court as Document No. _____ and noted on Certificate of Title No. _____.

5. According to a review of our business records, the Promissory Note granted by Cary D. Boucher to National Future Mortgage, Inc., dated July 28, 2008 in the original principal amount of $245,000.00 is currently owned by U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT.

6. U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT has the right to foreclose because the mortgage loan is in the default and U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT is the holder of the Mortgage and the holder of the Note or is the authorized agent of the Note holder.

7. A copy of the original promissory note secured by the Mortgage, together with all existing endorsements and allonges, is provided herewith.

Rushmore Loan Management Services LLC as Servicer for U.S. Bank National Association, not in its individual capacity but solely as Trustee for the RMAC Trust, Series 2016-CTT

6-1-22
_____
Date

By: _____ Mario Selva
Title:

ASSISTANT VICE PRESIDENT

■ Redacted information

 **NOTE**

Loan Number: ████ 

MIN: ████████

July 28, 2008      Gibbsboro      New Jersey
*[Date]*      *[City]*      *[State]*

**7 Fairbanks Lane, North Reading, MA 01864**
*[Property Address]*

**1.  BORROWER'S PROMISE TO PAY**

In return for a loan that I have received, I promise to pay U.S. $245,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is **NATIONAL FUTURE MORTGAGE, INC..** I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

**2.  INTEREST**

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of **7.000%**.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

**3.  PAYMENTS**

**(A) Time and Place of Payments**

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the 1st day of each month beginning on **September, 2008**. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on **August 1, 2038**, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **NATIONALSETTLEMENTS@COMCAST.NET, GIBBSBORO, NJ 08026** or at a different place if required by the Note Holder.

**(B) Amount of Monthly Payments**

My monthly payment will be in the amount of U.S. **$1,629.99** .

**4.  BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

---

*CPB*

5.    **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

6.    **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)  Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **3.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)  Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)  Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D)  No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)  Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7.    **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.    **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9.    **WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10.   **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same

date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)      _____ (Seal)
Cary D Boucher                       -Borrower                                      -Borrower

_____ (Seal)      _____ (Seal)
                                     -Borrower                                      -Borrower

*[Sign Original Only]*

LENDER:      NATIONAL FUTURE MORTGAGE, INC.

BORROWER:   Cary D Boucher

PROPERTY:    7 Fairbanks Lane, North Reading, MA 01864

LOAN NO./MIN: ███████████

# ENDORSEMENT ALLONGE TO NOTE

This Allonge to Note is to that certain Note dated July 28, 2008, executed by Cary D Boucher in the amount of $245,000.00, in favor of NATIONAL FUTURE MORTGAGE, INC. as payee.  This Allonge is affixed and becomes a permanent part of said Note.

PAY TO THE ORDER OF AmTrust Bank

WITHOUT RECOURSE.

LENDER: NATIONAL FUTURE MORTGAGE, INC.

Signature By:

Printed Name: Lisa SanPiepio

Title: Closing Manager

Cleveland, Ohio _____ 20 __
PAY TO THE ORDER OF
_____
Without Recourse
AmTrust Bank
FKA Ohio Savings Bank
BY: _____
Roslind Jones
Authorized Agent

When Recorded Return To:
Fannie Mae
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

# ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION**, the sufficiency of which is hereby acknowledged, the undersigned, **NATIONSTAR MORTGAGE LLC, WHOSE ADDRESS IS 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019, (ASSIGNOR)**, by these presents does convey, grant, assign, transfer and set over the described Mortgage together with all interest secured thereby, all liens, and any rights due or to become due thereon to **U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR THE RMAC TRUST, SERIES 2016-CTT, WHOSE ADDRESS IS 60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE)**.

Said Mortgage bearing the date **07/28/2008**, made and executed by **CARY D BOUCHER AND ROBIN L BOUCHER**, mortgagor(s), to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NATIONAL FUTURE MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS**, mortgagee, and was recorded in the Office of the Register of Titles and County Recorder for **MIDDLESEX SOUTH** County, **Massachusetts**, in **Book 51535 and Page 48**.

Property is commonly known as: 7 FAIRBANKS LANE, NORTH READING, MA 01864.

**IN WITNESS WHEREOF**, this Assignment is executed by its Vice President of Loan Documentation **this 17th day of May in the year 2018**.
**NATIONSTAR MORTGAGE LLC**

**HOLLY HARDY**
**VICE PRESIDENT LOAN DOCUMENTATION**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

FNMA1 redacted                          MIN redacted                     MERS PHONE 1-888-679-6377
MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026 redacted                    EFRMMA1





redacted

An official website of the United States government. Here's how you know

**U.S. Attorney's Office**

December 3, 2014

# Last Defendant Set for Trial Pleads Guilty to Federal Rac Operation Wax House

CHARLOTTE, NC—John Wayne Perry, Jr., 33, of Charlotte, pleaded guilty on Monday, December 1, 2014, for his role as a promoter in Attorney's Office for the Western District of North Carolina. This conviction is the latest in Operation Wax House, an investigation which nine defendants charged have either pleaded guilty or have been convicted following a trial. Two remaining defendants are internationa

The United States Attorney's Office is joined in making today's announcement by John A. Strong, Special Agent in Charge of the Feder Thomas J. Holloman III, Special Agent in Charge of the Internal Revenue Service, Criminal Investigation Division (IRS-CI).

According to filed court documents and court proceedings, the racketeering enterprise operated from about 2005 until 2012 when the fe the enterprise engaged in an extensive pattern of racketeering activities, which included investment or securities fraud, mortgage fraud and the distribution of marijuana.

Court documents establish that Perry was a promoter in the enterprise's mortgage fraud operations. In particular, Perry arranged for a s throughout North Carolina to serve as a straw buyer on a million dollar home in Waxhaw. As part of the fraud, according to court docum laundered through his business account, falsely representing that the monies were for "brick work" when in truth there was no brick wor others for their participation in the fraud.

Perry's plea follows his motion to continue his November 17, 2014 trial. The new trial was reset for December 8, 2014. Perry pleaded g pending sentencing. The maximum prison term for the racketeering conspiracy charge is 20 years and a $250,000 fine. Perry is one of this extensive fraud.

The only two remaining defendants in the case are international fugitives:

- Ramin Amini, 45, of Tehran, Iran, is charged with racketeering conspiracy, mortgage fraud and money laundering conspiracy. Role fugitive.
- Nazeere Saddig, 41, formerly of Charlotte, is charged with racketeering conspiracy and mortgage fraud. Role: Promoter and buye

Operation Wax House in the Western District of North Carolina is being handled by the Charlotte Division of the FBI and the Criminal D Force, with the assistance of the Securities Division of the North Carolina Secretary of State. The prosecution is being handled by Assi

Today's announcement is part of efforts underway by President Obama's Financial Fraud Enforcement Task Force (FFETF) which was coordinated and proactive effort to investigate and prosecute financial crimes. With more than 20 federal agencies, 94 U.S. attorneys' c of law enforcement, investigatory and regulatory agencies ever assembled to combat fraud. Since its formation, the task force has mad prosecution of financial crimes; enhancing coordination and cooperation among federal, state and local authorities; addressing discrimi outreach to the public, victims, financial institutions and other organizations. Since the inception of FFETF in November 2009, the Justi cases against nearly 18,737 defendants including nearly 3,500 mortgage fraud defendants. For more information on the task force, visi

The names and case numbers of the all the defendants charged to date in Operation Wax House are listed below, organized by their al

**Attorneys and Paralegals**

- Crawford/Mallard, Michelle, 3:11cr374
- Gates, Christine, 3:09cr100
- Norwood, Kelli, 3:09cr162
- Rainer, Demetrius, 3:08cr239/241
- Smith, Troy, 3:08cr264

**Bank Insiders**

Bank insiders

- Brown, Jamilia, 3:10cr124

**Mortgage Brokers**

- Bradley, Bonnette, 3:12cr299
- Clarke, Linda, 3:10cr120
- Flood, Ericka, 3:10cr124
- Goodson-Hudson, Crystal, 3:12cr339
- Mahaney, Robert, 3:12cr340
- Scagliarini, Coley, 3:11cr374
- Staton, Walter, 3:10cr113
- Vaughn, Danielle, 3:12cr329
- Eason, Danyelle, 3:10cr116
- Henson, Vic. F., 3:10cr124
- Jackson, Mitzi, 3:11cr374
- Ramey, Bonnie Sue, 3:10cr124

**Builders and Sellers**

- Fink, James, 3:11cr374
- Jackson, Jennifer, 3:09cr241
- Smith, Kelvis, 3:12cr238
- Viegas, Jeffrey, 3:12cr298
- Wittig, Mark, 3:12cr335
- Wood, Gary, 3:09cr208

**Facilitators and Financiers**

- Hickey, Denis, 3:09cr103
- McClain, Landrick, 3:10cr124
- Mitchell, Ann Tyson, 3:12cr239
- Panayoton, Sherrill, 3:11cr176
- Taylor, Alicia Renee, 3:10cr124
- Wilson, Willard, 3:09cr161

**Buyers**

- Banks, Arketa, 3:12cr297

- Darden, Clinton, 3:10cr108
- Williams, Marcia, 3:12cr334
- Williams, Sean, 3:12cr336
- Woods, Joseph, 3:09cr178

### Real Estate Agents

- Belin, Chris, 3:11cr374
- Clark, Christina, 3:09cr44
- Lee, Shannon, 3:12cr338
- Pasut, Holly Hardy, 3:12cr331
- Wolf, Nathan Shane, 3:12cr239
- Wood, Gary, 3:09cr208

### Promoters

- Amini, Ramin, 3:12cr239
- Barnes, Vonetta Tyson, 3:12cr239
- Brown, William, 3:12cr239
- Bumpers, Travis, 3:12cr239
- Carr, Stephen, 3:10cr124
- Clarke, Reuben, 3:10cr120
- Coleman, Gregory, 3:10cr118

✉ **Stay Connected**

Get FBI email alerts

 Subscribe   No Thanks



1

REPORT REQUESTED BY:

Cary D. Boucher

2   7 Fairbanks Lane

North Reading, MA 01864

3

4

## AFFIDAVIT OF JOSEPH R. ESQUIVEL JR.

5   I, Joseph R. Esquivel Jr, declare as follows:

6   1.  I am over the age of 18 years and qualified to make this Affidavit.

7   2.  I am a licensed private investigator of in the State of Texas, License # A20449.

8   3.  I make this Affidavit based on my own personal knowledge.

9

4.  I make this Affidavit in support of Mortgage Compliance Investigations Chain of Title Analysis

10   & Mortgage Fraud Investigation requested by Cary D. Boucher regarding the Loan Instruments

11   and the associated real property located at 7 Fairbanks Lane, North Reading, MA 01864, as

12   referenced in the Middlesex South County Record.

13   5.  I have no direct or indirect interest in the outcome of the case at bar for which I am offering my

14   observations.

15   6.  I have personal knowledge and experience in the topic areas related to the securitization of

16   mortgage loans, real property law, Uniform Commercial Code practices, predatory lending

17   practices, assignment and assumption of securitized loans, creation of trusts under deeds of trust,

18   pooling and servicing agreements, issuance of asset-backed securities and specifically mortgage-

19   backed securities by special purpose vehicles in which an entity is named as trustee for holders

of certificates of mortgage backed securities, the foreclosure process of securitized and non-

20   securitized residential mortgages in both judicial and non-judicial states, and the various forms

21   of foreclosure-related fraud.

22   7.  I perform my research through the viewing of actual business records and Corporate/Trust

23   Documents.

24

8.  I perform my research through the viewing of actual business records and Corporate/Trust

25   Documents that have been obtained by Housing Mortgage Consultants (William McCaffrey). I

26   then analyze the information for the purpose of the investigation.

27

28

1

9. I have the training, knowledge and experience to perform these searches and understand the meaning of these records and documents with very reliable accuracy.

10. I am available for court appearances, in person or via telephone for further clarification or explanation of the information provided herein, or for cross examination if necessary.

11. Mr. McCaffrey of Housing Mortgage Consultants is also available for court appearances, in person or via telephone, for further clarification or explanation of the information provided herein, or for cross examination if necessary.

12. I have been hired by Cary D. Boucher to investigate and review documents pertaining to the property located at 7 Fairbanks Lane, North Reading, MA 01864. These documents have been obtained from the Middlesex South Registry of Deeds Office and from Rushmore Loan Management Services. Those documents are as follows:

| Exhibit | Document Name | Date Recorded | Document Number |
|---------|---------------|---------------|-----------------|
| A | Note | - Not Recorded - | |
| B | Mortgage | August 05, 2008 | 2008 00129640 Bk: 51535 Pg: 48 |
| C | Assignment of Mortgage | June 07, 2011 | 2011 00097915 Bk: 56598 Pg: 129 |
| D | Assignment of Mortgage | May 18, 2018 | 70351 Bk: 71030 Pg: 432 |

13. On May 12, 2022, the Cary D. Boucher Loan was identified in the RMAC 2016-CTT Trust. This trust is a Special Purpose Vehicle (SPV) which was created for the purpose of issuing mortgage-backed securities.

14. The returns that are paid on the mortgage-backed securities are derived from "slices" ("tranches") of the pool of comingled payments. "Pooling" (commingling) these trust assets to back financial instruments purportedly serve as the foundation for the instruments (as "securities") being offered and sold to secondary-market investors, in the process known as "securitization."

15. The information contained herein was derived by research through professional services, and by reviewing the Loan Level Data obtained from the U.S. Bank Investor Online Portal on May 12, 2022, by independent third-party securitization and banking expert, William McCaffrey (Housing Mortgage Consultants Inc.), who specializes in locating Residential Mortgage-Backed

1  Securities, (RMBS), and VA, FHA and GSE loans. Several identifying loan indicators were

2  researched, including the loan number for the Cary D. Boucher Loan (located on the Note, attached hereto as Exhibit "A," and on the Mortgage, attached as Exhibit "B").

3

4  16. Based on the research that I have conducted, the evidence shows, that the Cary D. Boucher Loan

5  is currently in the RMAC 2016-CTT Trust as shown by the information below, as of May 12,

6  2022. The Loan was sold to Fannie Mae shortly after signing and then on March 03, 2018, Fannie Mae sold the Boucher loan to the RMAC 2016-CTT Trust.

7  The Loan Level Data information for the Cary D. Boucher loan below was obtained from the

8  Fannie Mae Pool Talk Online Portal by an independent third party (Housing Mortgage Consultants), William McCaffrey on May 12, 2022

9  Search Results – Guaranteed REMIC Pass-Through Certificates Fannie Mae REMIC Trust 2008-

10  74 then to RMAC 2016-CTT

11

```
1|1189509|N|7994018|wholesale      |NATIONAL FUTURE MORTGAGE
INC|NATIONSTAR MORTGAGE LLC          | 7.000| 7.000| 7.000|
000245000.00| 000245000.00|360|09/2008| 000|360|09/2038|080|080|01|
|679|NO |PURCHASE|SF    |1|PRINCIPAL|MA|01864    |FRM| |NO | 1629.99
| P  |  |2008-074        |        |  |
```

14  The information below was taken from above, put into a vertical column and the information was

15  cross indexed with the Cary D. Boucher Note and Mortgage as to show the matching indicators

16  information.

```
1
|1189509 - ID number for Trust
|N
|7994018 - Corresponding Loan Number on the Note and Mortgage
|wholesale - Classification of Loan - Retail, Wholesale or Corresponding
|NATIONAL FUTURE MORTGAGE INC - Seller of Loan to Federal National
Mortgage Association (Fannie Mae)
|NATIONSTAR MORTGAGE LLC - Servicer of Loan
| 7.000 - the actual interest rate that the loan was purchased at
| 7.000 - Original Interest Rate - Matches Note
| 7.000 - Triad Coupon Rate
| 000245000.00 - Original loan amount - Matches Note and Mortgage
| 000245000.00 - Premium Price sold to Federal National Mortgage
Association
|360 - Length of Loan in months - Matches Note
|09/2008 - Date of First Payment for loan - Matches Note
| 000
|360
|09/2038 - Date of Maturity - Matches Note
|080 - LTV
|080 - LCTV
|01 - No Prepay
```

3

```
|
|679 - FICO Score
|NO - Refinance
|PURCHASE - (Type of Loan) vs Refinance
|SF - Single Family Residence
|1 - 1 would be Primary or (2 would be 2nd home and 3 would be investor
|PRINCIPAL - Primary home no second home or investor
|MA - State Abbreviation - Matches Note and Mortgage
|01864 - Property Zip Code - Matches Note and Mortage
|FRM - Fixed Mortgage Rate vs Adjustable Mortgage Rate
|
|NO
| 1629.99 - Monthly payment - Matches Note
| P
|
|2008-074 - Trust Series
|
|
|
```

The Loan Level Data information for the Cary D. Boucher loan below was obtained from the U.S. Bank Investor Online Portal by an independent third party (Housing Mortgage Consultants), William McCaffrey on May 12, 2022

Search Results – RMAC 2016-CTT

| loan_id | pool_id | loan_closing_date | deal_closing_date | credit_score |
|---|---|---|---|---|
| redacted | RMAC 2016-CTT-1 | | 10/30/2018 | |
| **Matches Note** | **Trust Series** | | | |
| **Matches Mortgage** | | | | |

| documentation_type | occupancy_type | original_interest_rate | original_loan_bal |
|---|---|---|---|
| | Owner Occupied | 7 | 245000 |
| | | **Matches Note** | **Matches Note** |
| | | | **Matches Mortgage** |

| original_securitized_bal | original_amoritization_term | ltv_rat | dti_rate | pp_flag |
|---|---|---|---|---|
| 24053.11 | 360 | 0 | | N |
| | **Matches Note** | | | |

Affidavit of Joseph R. Esquivel, Jr. for – Cary D. Boucher - 7 Fairbanks Lane, North Reading, MA 01864

| prepayment_penalty_term | product_type | property_state | property_type | loan_purpose_type |
|---|---|---|---|---|
| | Not Applicable | MA | Single Family | Cash-out (Equity) refinance |

**Matches Note**

**Matches Mortgage**

| risk_grade_score | lien_position_type | cltv_rate | cutoff_date | loanage_count | mss_count | interest_rate |
|---|---|---|---|---|---|---|
| | | | 10/30/20118 | | 134 | 7 |

| beg_prin_bal | loan_status | delq_bucket | prepayment_amount | liquidation_bal |
|---|---|---|---|---|
| 11280.28 | Repurchase | Current | 0 | 0 |

| current_gain_loss_amount | end_prin_bal | sched_prin | originator | servicer | intcalctype | ratetype |
|---|---|---|---|---|---|---|
| 0 | 0 | 1629.99 | | NationStar | | FIX |

**Matches Note**

| ioterm | margin | origterm | rterm | zfraperiod | mthroll | initratecp | perratecp | perpaycp | liferatecp |
|---|---|---|---|---|---|---|---|---|---|
| | | 360 | 101 | | | | | | |

**Matches Note**

| ratemax | ratemin | ngmType | ngmAmt | ratefreq | payfreq | dnextrate | currltv | PropZip | pmitype | Silent2nd |
|---|---|---|---|---|---|---|---|---|---|---|
| 0 | | | | 0 | 0 | | | 1864 | | |

| simultaneous2nd | blntype | group | pldgtype | pldgamt | eltv | svcrate | otherrate | heloc | modtype | cnvtype |
|---|---|---|---|---|---|---|---|---|---|---|
| | N | 1 | | | | 0.5 | 0.006 | | N | |

Affidavit of Joseph R. Esquivel, Jr. for – Cary D. Boucher - 7 Fairbanks Lane, North Reading, MA 01864

| PI | | Next_Due | Payoff Date | Act_Bal | Draw | DrawPrd | CreditLimit | Curtailments | PPPenalties |
|---|---|---|---|---|---|---|---|---|---|
| 1629.99 | | 1/1/2018 | | 0 | 0 | | | 0 | 0 |

Matches Note

| NetInterest | NonRecAdvances | REOBook | REOBookDt | REODt | RAIS |
|---|---|---|---|---|---|
| 0 | 0 | 0 | | 0 | |

17. "Loan Level Data" refers to specific loan characteristics of the loan. Examples of different types of specific data types would be "Loan number," "Original Balance," "Maturity Date," "Property State," "Property Zip Code," "Property City," "Pool Number," and many more. Depending on the information that was available when the information was inputted and entered into the data platform, some loans would have more data available and others would have less.

18. Securitization is the process of "aggregating" (i.e., commingling) the payments from a large number of mortgage loans into what is called a "mortgage pool" and then selling "shares" (called "certificates") to investors, who then receive "returns" over a specific time period. The "pool" of commingled mortgage payments is "sliced" into "tranches" from which many different "classes" of investments (with varying rates of "returns") are created, and subsequently offered for sale by way of a "prospectus." Based on this information, Cary D. Boucher's mortgage payments ultimately flowed to and/or through the "pool" created by or on behalf of the RMAC 2016-CTT Trust. However, in my opinion, it is impossible to determine the exact amounts from any mortgage payment paid out to any specific investor, as this was done *after* Cary D. Boucher's payments were commingled with other monies.

19. The indicators pertaining to the Cary D. Boucher loan show that the loan was securitized; and that RMAC 2016-CTT paid value for the Cary D. Boucher debt which was the right to collect future payments for the Cary D. Boucher mortgage loan which purportedly translates to the right to collect future payments for the Cary D. Boucher loan.

//

6

20. Residential mortgage-backed securities, or RMBS, are bonds or notes created by securitization that are backed by residential mortgages or residential real estate loans. RMBS originators are typically financial institutions that originate residential real estate or residential mortgage loans, including banks, building societies/savings & loans and mortgage finance companies. However, issuers could also include government-guaranteed securities issued following bank bailouts, such as TARP or TALF, and the Government Sponsored Enterprises Fannie Mae and Freddie Mac.

21. To create residential mortgage-backed securities, or RMBS, institutions sell pools of their loans to a special-purpose vehicle, or SPV, which then sells the loans to a trust. The trust then repackages the loans as interest-bearing securities and issues them. This true sale of the loans to the SPV ensures that the RMBS is treated as bankruptcy-remote from the originator.

22. These trust entities are REMIC'S in which the IRS describes a (Real Estate Mortgage Investment Conduit) REMIC as an entity formed for the purpose of holding a fixed pool of mortgages secured by interests in real property (IRS Publication 550, Investment Income and Expenses, 2015)

23. Without these transactions going thru the proper parties, valid transactions can not take place and that would leave the trust without having properly secured assets for the certificate holders.

24. Failure of naming the trust on the endorsement is a failure of transferring the instrument to the Trust.

25. I have examined a purported to be true and correct copy of a Promissory Note of Cary D. Boucher dated July 28, 2008, regarding a loan for $245,000.00. The Original Lender of the July 28, 2008, Boucher loan is National Future Mortgage, Inc., (See Exhibit "A" attached within)

   a. This copy of the Cary D. Boucher Note shows an indorsement, in the form of an allonge to the Note, from National future Mortgage, Inc., signed by Lisa Santaepro as Closing Manager, made payable to AmTrust Bank.

   b. This Allonge is undated.

   c. This copy of the Cary D. Boucher Note also has an incomplete stamping on the Allonge itself from AmTrust Bank AFKA Ohio Savings Bank, signed by Roslind Jones as Authorized Agent, made payable to an as of yet unnamed payee.

---

Affidavit of Joseph R. Esquivel, Jr. for – Cary D. Boucher - 7 Fairbanks Lane, North Reading, MA 01864

26. The Guaranteed REMIC Pass-Through Certificates Fannie Mae REMIC Trust 2008-74 are not named in any way on the Cary D. Boucher Note.

    a. The Federal National Mortgage Association not in its Individual Capacity but solely as Trustee for Guaranteed REMIC Pass-Through Certificates Fannie Mae REMIC Trust 2008-74 is not named anywhere within the Cary D. Boucher Note.

27. There is no evidence that Guaranteed REMIC Pass-Through Certificates Fannie Mae REMIC Trust 2008-74 ever received an ownership interest in the Cary D. Boucher Note.

28. Paragraph 1 of the Cary D. Boucher Note states *"I understand that the Lender may transfer this Note. The Lender or Anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Noteholder."*

29. The RMAC 2016-CTT Trust is not named in any way on the Cary D. Boucher Note.

    a. U.S. Bank National Association as Trustee for the RMAC 2016-CTT not in its Individual Capacity but solely as Trustee for RMAC 2016-CTT is not named anywhere within the Cary D. Boucher Note.

30. There is no evidence that RMAC 2016-CTT ever received an ownership interest in the Cary D. Boucher Note.

31. I have examined a Mortgage of Cary D. Boucher dated July 28, 2008 and filed in the Official Records of the Middlesex South Registry of Deeds Office on August 05, 2008 as ins# 2008 00129640 Bk: 51535 Pg: 48. (See Exhibit "B" attached within)

    a. The **Federal National Mortgage Association** is not named in any way to the Cary D. Boucher Mortgage

    b. The Guaranteed REMIC Pass-Through Certificates Fannie Mae REMIC Trust 2008-74 is not named or referenced in any way on the Cary D. Boucher Mortgage.

    c. Nationstar Mortgage LLC is not named or referenced in any way on the Cary D. Boucher Mortgage, however they are named in an Assignment of Mortgage filed in the Official Records of the Middlesex South Registry of Deeds Office on May 18, 2018.

8

d. U.S. Bank National Association is not named or referenced in any way on the Cary D. Boucher Mortgage, however they are named in an Assignment of Mortgage filed in the Official Records of the Middlesex South Registry of Deeds Office on May 18, 2018.

32. I have examined the Middlesex South County Record relating to the Cary D. Boucher Mortgage dated July 28, 2008. The Middlesex South County Record shows an "Assignment of Mortgage", dated May 25, 2011, and filed in the Official Records of the Middlesex South Registry of Deeds Office on June 07, 2011 as ins# 2011 00097915 Bk: 56598 Pg: 129, signed by Ryan Sabo as Assistant Vice President for New York Community Bank and notarized May 25, 2011 by La'Somanic Lawson, Ohio Notary Commission #N/A, where New York Community Bank grants, assigns, and transfers to Nationstar Mortgage LLC. (See Exhibit "C" attached within)

33. There is no sale of the Cary D. Boucher Mortgage Loan caused through the Cary D. Boucher Assignment of Mortgage.

34. New York Community Bank has produced no evidence to support that it had the authority to assign the mortgage to Nationstar Mortgage LLC. On December 4, 2009, AmTrust Bank, Cleveland, OH, was closed by the Office of Thrift Supervision. The Federal Deposit Insurance Corporation (FDIC) was then named Receiver. Subsequent to the closure, New York Community Bank, Westbury, NY acquired substantially all the deposits and assets of AmTrust Bank from the FDIC as Receiver for AmTrust Bank. Any claims by equity holders were not acquired.

35. The loan was sold to Fannie Mae by National Future Mortgage, Inc., prior to the closing of AmTrust Bank. AmTrust Bank never paid value for the debt as it was purchased by Fannie Mae shortly after closing. New York Community Bank only acquired the servicing rights of the Cary D. Boucher loan from AmTrust Bank.

36. I have examined the Middlesex South County Record relating to the Cary D. Boucher Mortgage dated July 28, 2008. The Middlesex South County Record shows an "Assignment of Mortgage", dated May 17, 2018, and filed in the Official Records of the Middlesex South Registry of Deeds Office on May 18, 2018, as ins# 70351 Bk: 71030 Pg: 432, signed by Holly Hardy as Vice President Loan Documentation and notarized May 17, 2018, by Nicole Shields, Florida Notary Commission #GG126925, where Nationstar Mortgage LLC grants, assigns, and transfers to U.S. Bank National Association. (See Exhibit "D" attached within).

9

37. There is no sale of the Cary D. Boucher Mortgage Loan caused through the Cary D. Boucher Assignment of Mortgage.

38. It is my expert opinion, there was no "true sale" of the Cary D. Boucher Mortgage Loan caused through the Cary D. Boucher either recorded Assignments of Mortgage.

39. Based on my examination, as RMAC 2016-CTT has never acquired rights to the Cary D. Boucher Note and those rights can not be transferred to another party.

40. In my professional opinion, all the available evidence that I have examined lacks proof, or even a showing, of any proper transfer of the debt obligation (purportedly evidenced by the note) along with proper transfer of collateral rights in the real property (purportedly evidenced by the Mortgage) regardless of any verbiage inserted into the various assignments. In fact, there is no evidence that suggests the Cary D. Boucher note was properly transferred simultaneously with any purported transfer of the beneficial rights in the Cary D. Boucher Mortgage.

The above statements are affirmed by me under penalty of perjury under the laws of the State of Texas to be true and correct to the best of my knowledge and belief, are based on my own personal knowledge, and I am competent to make these statements.

FURTHER THE AFFIANT SAYETH NAUGHT

By: _Joseph R Esquivel Jr_

LORI M. ESQUIVEL
My Notary ID # 130167889
Expires March 25, 2023

Joseph R Esquivel, Jr.
Private Investigator License # A20449
Mortgage Compliance Investigations LLC

STATE OF TEXAS          )
                        )
COUNTY OF TRAVIS        )

Subscribed and sworn before me, ____Lori M Esquivel____, Notary Public, on this ____25th____ day of ____May____, 2022 by Joseph R Esquivel, Jr proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

WITNESS my hand and official seal.

_____
Notary Public

Affidavit of Joseph R. Esquivel, Jr. for – Cary D. Boucher - 7 Fairbanks Lane, North Reading, MA 01864

ORIGINAL

# NOTE

Loan Number: redacted

MIN.: redacted

| July 28, 2008 | Gibbsboro | New Jersey |
|:---:|:---:|:---:|
| *[Date]* | *[City]* | *[State]* |

**7 Fairbanks Lane, North Reading, MA 01864**
*[Property Address]*

### 1.   BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $245,000.00  (this amount is called "Principal"), plus interest, to the order of the Lender.  The Lender is **NATIONAL FUTURE MORTGAGE, INC..**  I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2.   INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid.  I will pay interest at a yearly rate of  7.000%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

### 3.   PAYMENTS

(A)  Time and Place of Payments

I will pay Principal and interest by making a payment every month.

I will make my monthly payment on the  1st day of each month beginning on  September, 2008.  I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note.  Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal.  If, on  August 1, 2038, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at **NATIONALSETTLEMENTS@COMCAST.NET, GIBBSBORO, NJ 08026** or at a different place if required by the Note Holder.

(B)  Amount of Monthly Payments

My monthly payment will be in the amount of U.S. **$1,629.99** .

### 4.   BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due.  A payment of Principal only is known as a "Prepayment."  When I make a Prepayment, I will tell the Note Holder in writing that I am doing so.  I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge.  The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note.  However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note.  If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

Multistate Fixed Rate Note—Single Family—Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
—THE COMPLIANCE SOURCE, INC.—
www.compliancesource.com
Page 1 of 3

Form 3200 01/01
12601MU 08/00
©2000, The Compliance Source, Inc.
redacted

# EXHIBIT "A"

date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)          _____ (Seal)
Cary D Boucher                 -Borrower                                          -Borrower

_____ (Seal)          _____ (Seal)
                               -Borrower                                          -Borrower

*[Sign Original Only]*

LENDER:       NATIONAL FUTURE MORTGAGE, INC.

BORROWER:   Cary D Boucher

PROPERTY:    7 Fairbanks Lane, North Reading, MA 01864

LOAN NO./MIN:   redacted

# ENDORSEMENT ALLONGE TO NOTE

This Allonge to Note is to that certain Note dated **July 28, 2008**, executed by **Cary D Boucher** in the amount of **$245,000.00**, in favor of **NATIONAL FUTURE MORTGAGE, INC.** as payee.  This Allonge is affixed and becomes a permanent part of said Note.

PAY TO THE ORDER OF AmTrust Bank

WITHOUT RECOURSE.

LENDER: NATIONAL FUTURE MORTGAGE, INC.

Signature By: _____

Printed Name: _Lisa Santaepio_

Title: _Closing Manager_

Cleveland, Ohio _____ 20 ___
PAY TO THE ORDER OF

_____

Without Recourse
AmTrust Bank
AFKA Ohio Savings Bank

BY: _____
Roslind Jones
Authorized Agent

# EXHIBIT "B"

Total Number of Pages: 14
Property Address: 7 Fairbanks Lane, North Reading, MA 01864

After recording please return to:
AmTrust Bank Final Documents Department
[Name]
    NATIONAL SETTLEMENT SOLUTIONS, INC.
    2 EASTWICK DRIVE
    SUITE 300
[Attention]
    GIBBSBORO, NJ 08026
1111 Chester Ave, Suite 200, Mail Code: OH98-0201
[Street Address]
Cleveland, Ohio 44114-3516
[City, State, Zip Code]



2008 00129340
Bk: 51535 Pg: 48   Doc: MTG
Page: 1 of 15   08/05/2008 11:10 AM

_____ [Space Above This Line For Recording Data] _____

Loan Number: redacted

MIN: redacted

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A)** "Security Instrument" means this document, which is dated **July 28, 2008**, together with all Riders to this document.

**(B)** "Borrower" is **CARY D. BOUCHER, A MARRIED MAN.** Borrower is the trustor under this Security Instrument.

**(C)** "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

**(D)** "Lender" is **NATIONAL FUTURE MORTGAGE, INC.**. Lender is a corporation organized and existing under the laws of The State of New Jersey. Lender's address is 2 Eastwick Dr. Suite 300, Gibbsboro, NJ 08026.

**(D-1)** **Mortgage Broker/Mortgage Originator.**
    The name of the Mortgage Broker is No mortgage broker was involved in the placing of this loan. Mortgage Broker's post office address is N/A. Mortgage Broker's license number is N/A. The name of the Mortgage Loan Originator is No mortgage loan officer was involved in the placing of this loan. Mortgage Loan Originator's post office address is N/A. Mortgage Loan Originator's license number is N/A.

---

(E)    "**Note**" means the promissory note signed by Borrower and dated **July 28, 2008**. The Note states that Borrower owes Lender **Two Hundred Forty Five Thousand  and 00/100ths Dollars** (U.S. **$245,000.00**) plus interest.  Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **August 1, 2038.**

(F)    "**Property**" means the property that is described below under the heading "Transfer of Rights in the Property."

(G)    "**Loan**" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(H)    "**Riders**" means all Riders to this Security Instrument that are executed by Borrower.  The following Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider        ☐ Condominium Rider                ☐ Second Home Rider
☐ Balloon Rider                ☐ Planned Unit Development Rider   ☐ Biweekly Payment Rider
☐ 1-4 Family Rider             ☐ Revocable Trust Rider
☐ Other(s) [specify]

(I)    "**Applicable Law**" means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(J)    "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K)    "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account.  Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L)    "**Escrow Items**" means those items that are described in Section 3.

(M)    "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N)    "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O)    "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.



**(P)**     **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter.  As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q)**     **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.  For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the

|                              |     |                              |
|:----------------------------:|:---:|:----------------------------:|
| **County**                   | of  | **Middlesex**                |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] |

**See Attached Exhibit A**

which currently has the address of 7 **Fairbanks Lane**
                                   [Street]

**North Reading**          , Massachusetts  **01864**                         ("Property Address"):
[City]                          [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property.  All replacements and additions shall also be covered by this Security Instrument.  All of the foregoing is referred to in this Security Instrument as the "Property."  Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:  to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record.  Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.



UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1.  **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2.  **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3.  **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly

furnish to Lender all notices of amounts to be paid under this Section.  Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require.  ~~Borrower's obligation to make such payments and to provide receipts shall for all purposes be~~ deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9.  If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA.  Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank.  Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA.  Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge.  Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds.  Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds.  Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA.  If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments.  If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4.   Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower:  (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over

this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.     Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by



this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6.   **Occupancy.**   Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7.   **Preservation, Maintenance and Protection of the Property; Inspections.**   Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8.   **Borrower's Loan Application.**   Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9.   **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.

Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:



(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.  "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling



that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument.  The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12.  Borrower Not Released; Forbearance By Lender Not a Waiver.**  Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower.  Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13.  Joint and Several Liability; Co-signers; Successors and Assigns Bound.**  Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument.  Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing.  The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14.  Loan Charges.**  Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees.  In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee.  Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower.  Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note).  Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15.  Notices.**  All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable



Law expressly requires otherwise.  The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender.  Borrower shall promptly notify Lender of Borrower's change of address.  If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure.  There may be only one designated notice address under this Security Instrument at any one time.  Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower.  Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender.  If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16.  Governing Law; Severability; Rules of Construction.**  This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located.  All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law.  Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract.  In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument:  (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17.  Borrower's Copy.**  Borrower shall be given one copy of the Note and of this Security Instrument.

**18.  Transfer of the Property or a Beneficial Interest in Borrower.**  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19.  Borrower's Right to Reinstate After Acceleration.**  If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of:  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument.  Those conditions are that Borrower:  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay



such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check; provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any

CDB
RCB

Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the STATUTORY POWER OF SALE and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the STATUTORY POWER OF SALE, Lender shall mail a copy of a notice of sale to Borrower, and to other persons prescribed by Applicable Law, in the manner provided by Applicable Law. Lender shall publish the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waivers. Borrower waives all rights of homestead exemption in the Property and relinquishes all rights of curtsey and dower in the Property.

The following signature(s) and acknowledgment(s) are incorporated into and made a part of this Massachusetts Mortgage dated July 28, 2008 between CARY D. BOUCHER, A MARRIED MAN, and NATIONAL FUTURE MORTGAGE, INC..

CDB
RLB

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____(Seal)          _____(Seal)
**Cary D Boucher**          -Borrower          **ROBIN L BOUCHER**          -Borrower
[Printed Name]          [Printed Name]

_____(Seal)          _____(Seal)
          -Borrower          -Borrower
[Printed Name]          [Printed Name]

## ACKNOWLEDGMENT

State of MA                    §
                               §
County of middlesex            §

On this 28 day of JULY 2008 before me, the undersigned notary public, personally appeared **Cary D Boucher** and **ROBIN L BOUCHER**, proved to me through satisfactory evidence of identification, which were MA Drivers license be the person whose name is signed on the preceding or attached document, and acknowledged to me that he/she signed it voluntarily for its stated purpose.

In witness whereof I hereunto set my hand and official seal.

_____
Official Signature of Notary

Kristy M. DeSisto
Printed Name

Attorney/Notary
Title of Officer

My Commission Expires: 4-9-2015

- (Seal)

KRISTY M. DeSISTO
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
April 9, 2015

EXHIBIT A

THE LAND IN NORTH READING, MIDDLESEX COUNTY, MASSACHUSETTS
AND BEING SHOWN AS LOT NO. 7 ON A PLAN ENTITLED,
"DEFINITIVE SUBDIVISION PLAN OF FAIRBANKS ESTATES",
PREPARED FOR:  TOWER HOMES, INC.", BY THOMAS E. NEVE
ASSCIATES, INC., ENGINEERS - SURVEYORS - LAND USE PLANNERS,
DATED JUNE 1, 2001 RECORDED WITH MIDDLESEX COUNTY (SOUTHERN
DISTRICT) REGISTRY OF DEEDS, PLAN NUMBER 32 OF 2002,
INSTRUMENT NO. 1256 OF JANUARY 10TH, 2002.

BEGINNING AT A POINT ON THE SOUTHERLY SIDELINE OF FAIRBANKS
LANE A THE FRONT CORNER OF LOTS 7 AND 8;

THENCE TURNING AND RUNNING ALONG THE SOUTHERLY SIDELINE OF
FAIRBANKS LANE SOUTH 86 DEGREES 05 MINUTES 26 SECONDS EAST
A DISTANCE OF 155.71 FEET TO A POINT;

THENCE TURNING AND RUNNING ALONG THE SOUTHERLY SIDELINE OF
FAIRBANKS LANE ALONG A CURVE TO THE RIGHT HAVING A RADIUS
OF 323.75 FEET A DISTANCE OF 12.50' TO A CORNER AT LOT 6;

THENCE TURNING AND RUNNING ALONG LOT 6 SOUTH 05 DEGREES 10
MINUTES 44 SECONDS  WEST A DISTANCE OF 86.81 FEET TO A
POINT;

THENCE TURNING AND RUNNING ALONG LOT 6 SOUTH 04 DEGREES 07
MINUTES 23 SECONDS EAST A DISTANCE OF 420.69 FEET TO A
CORNER AT LAND OF NORTH HILL RECREATIONAL TRUST, LAND OF
1998 REALTY TRUST AND LOT 6;

THENCE TURNING AND RUNNING ALONG LAND OF NORTH HILL
RECREATIONAL TRUST NORTH 63 DEGREES 25 MINUTES 09 SECONDS
WEST A DISTANCE OF 238.34 FEET TO A CORNER AT LOT 8;

THENCE TURNING AND RUNNING ALONG LOT 8 NORTH 05 DEGREES 46
MINUTES 38 SECONDS EAST A DISTANCE OF 366.13 FEET TO A
POINT;

THENCE TURNING AND RUNNING ALONG LOT 8 NORTH 16 DEGREES 32
MINUTES 18 SECONDS WEST A DISTANCE OF 48.87 FEET TO THE
POINT OF BEGINNING.

MEANING AND INTENDING TO CONVEY LOT 7, CONTAINING 81,036
SQUARE FEET OR 1.86 ACRES OF LAND AS SHOWN ON A DEFINITIVE
SUBDIVISION PLAN OF "FAIRBANKS ESTATES", NORTH READING,
MASSACHUSETTS, SHEET 2 OF 9, PREPARED FOR TOWER REALTY
TRUST AND PREPARED BY THOMAS E. NEVE ASSOCIATES, INC.
REVISED DATED OCTOBER 29, 2001.

*Eugene C. Brune*

Attest Middlesex S. Register

ADDRESS: 7 FAIRBANKS LANE;  NORTH READING, MA 01864   TAX
MAP OR PARCEL ID NO.: 61-99

T.R    37909-107

# EXHIBIT "C"

Record and Return to:
Doonan, Graves, & Longoria
Attn: Brian Linehan
100 Cummings Center
Suite 225D
Beverly, MA 01915



2011 00097915
Bk: 56958 Pg: 129   Doc: ASM
Page: 1 of 2   06/07/2011 02:16 PM

## ASSIGNMENT OF MORTGAGE

    Know that, for valuable consideration, New York Community Bank. ("ASSIGNOR"), hereby sells, assigns, and transfers to Nationstar Mortgage LLC ("ASSIGNEE"), whose mailing address is 350 Highland Drive, Lewisville, Texas 75067, the Assignor's interest in a certain mortgage made by Cary D. Boucher to Mortgage Electronic Registration Systems, Inc., as nominee for National Future Mortgage, Inc. dated July 28, 2008 and recorded in the Middlesex County (Southern District) Registry of Deeds in Book 51535, Page 48, describing land therein as:

7 Fairbanks Lane, North Reading, MA

New York Community Bank
**Assignor**

Dated: __5/25/11__

By: _____

Its: Ryan Sabo
Assistant Vice President

State of __OH__ )
County of __Cuyahoga__ ) ss.

On __5/25/2011__, before me, La'Somanic Lawson Notary Public, personally appeared __Ryan Sabo__, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies) and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of __OH__ that the foregoing paragraph is true and correct.

Witness my hand and official seal.

_____
(Notary signature)

LA'SOMANIC LAWSON
Notary Public, State of Ohio
Recorded in Cuyahoga County
My Commission Expires
March 3, 2014

Mortgage Broker

Name: _____

Address: _____

License #: _____

Mortgage Originator

Name: _____

Address: _____

License #: _____

# Middlesex South Registry of Deeds

# Electronically Recorded Document

### This is the first page of the document - Do not remove

---

### Recording Information

Document Number            : 70351
Document Type              : ASM
Recorded Date              : May 18, 2018
Recorded Time              : 03:21:40 PM

Recorded Book and Page             : 71030 / 431
Number of Pages(including cover sheet)  : 3
Receipt Number             : 2209099
Recording Fee              : $75.00

**Middlesex South Registry of Deeds**
**Maria C. Curtatone, Register**
**208 Cambridge Street**
**Cambridge, MA 02141**
**617-679-6300**
**www.middlesexsouthregistry.com**

When Recorded Return To:
Fannie Mae
C/O Nationwide Title Clearing, Inc.
2100 Alt. 19 North
Palm Harbor, FL 34683

# ASSIGNMENT OF MORTGAGE

**FOR GOOD AND VALUABLE CONSIDERATION,** the sufficiency of which is hereby acknowledged, the undersigned, **NATIONSTAR MORTGAGE LLC, WHOSE ADDRESS IS 8950 CYPRESS WATERS BLVD., COPPELL, TX 75019, (ASSIGNOR),** by these presents does convey, grant, assign, transfer and set over the described Mortgage together with all interest secured thereby, all liens, and any rights due or to become due thereon to **U.S. BANK NATIONAL ASSOCIATION, NOT IN ITS INDIVIDUAL CAPACITY, BUT SOLELY AS TRUSTEE FOR THE RMAC TRUST, SERIES 2016-CTT, WHOSE ADDRESS IS 60 LIVINGSTON AVENUE, EP-MN-WS3D, ST. PAUL, MN 55107, ITS SUCCESSORS AND ASSIGNS, (ASSIGNEE).**

Said Mortgage bearing the date **07/28/2008,** made and executed by **CARY D BOUCHER AND ROBIN L BOUCHER,** mortgagor(s), to **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., AS NOMINEE FOR NATIONAL FUTURE MORTGAGE, INC., ITS SUCCESSORS AND ASSIGNS,** mortgagee, and was recorded in the Office of the Register of Titles and County Recorder for **MIDDLESEX SOUTH** County, **Massachusetts,** in **Book 51535 and Page 48.**

Property is commonly known as: 7 FAIRBANKS LANE, NORTH READING, MA 01864.

**IN WITNESS WHEREOF,** this Assignment is executed by its Vice President of Loan Documentation **this 17th day of May in the year 2018.**
NATIONSTAR MORTGAGE LLC

_____
**HOLLY HARDY**
**VICE PRESIDENT LOAN DOCUMENTATION**

All persons whose signatures appear above have qualified authority to sign and have reviewed this document and supporting documentation prior to signing.

FNMA1 redacted 2018-NPL1-PL2-3-SALE MIN redacted          MERS PHONE 1-888-679-6377

MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026 redacted       09:27:55 [C-1]   EFRMMA1



redacted

**Loan:** redacted

STATE OF FLORIDA    COUNTY OF PINELLAS
The foregoing instrument was acknowledged before me on this 17th day of May in the year 2018, by Holly Hardy as Vice President of Loan Documentation of NATIONSTAR MORTGAGE LLC, who, as such Vice President of Loan Documentation being authorized to do so, executed the foregoing instrument for the purposes therein contained. He/she/they is (are) personally known to me.



NICOLE SHIELDS
COMM EXPIRES: 08/05/2020

NICOLE SHIELDS
Notary Public – State of Florida
My Comm. Expires August 5, 2020
Commission # GG126925

☐ No Mortgage Broker was involved in the placing of this loan.
Mortgage Broker's  Name:
Address:
License:

☐ No Mortgage Loan Originator was involved in the placing of this loan.
Mortgage Loan Originator's  Name:
Address:
License:

**Instrument Prepared By: Dave LaRose/NTC, 2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152**
FNMA1 redacted   2018-NPL1-PL2-3-SALE   MIN redacted          MERS PHONE 1-888-679-6377
MERS Mailing Address: P.O. Box 2026, Flint, MI 48501-2026  DOCR redacted 09:27:55 [C-1]   EFRMMA1



redacted

5.  **LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

6.  **BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A) Late Charge for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be **3.000%** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

7.  **GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

8.  **OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

9.  **WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

10. **UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same

# COMMONWEALTH OF MASSACHUSETTS

WORCESTER, SS.

CIVIL ACTION NO. ~~22 2285~~

22-cv-1149 (A)

# FILED

Robert, Border
Cay D. Border
_____

### PLAINTIFF(S)

OCT 1 2 2022

Emergent
**MOTION** ATTEST [signature] CLERK
for
Injunctive Relief

### VS.

U.S. Bak National Association, as Trustee
_____

### DEFENDANT(S)

③

Now come the Plaintiffs, by counsel, and respectfully request that this Honorable Court enjoin the auction scheduled for tomorrow, October 13th at 11:00 a.m. at 7 Fairbanks Lane on North Reading, MA from going forward.

The factual basis for such injunction and the legal declaration is delineated in the Verified Complaint filed in parallel with this Motion.

Wherefore, the Plaintiffs respectfully request that this Honorable Court Stop the foreclosure Scheduled

for tomorrow Oct 13, 2000 at
11 80 c.

Signature _____

Printed Name: Jay P. Ehrler

Address: Ehrler & Assa. P.C
250 Commercial Stre
Worcest, MA 01605

Phone Number  508.794.8411

BBo#651797